## JOHN ROWLAND WOODRUFF v. FRANCES SIDDALL WOODRUFF.

107 N. W. (2d) 714.

February 3, 1961—No. 38,103.

*Patrick J. Casey,* for appellant.
*Osmund H. Ause,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action for divorce by plaintiff, John Rowland Woodruff, against defendant, Frances Siddall Woodruff, on the ground of cruel and inhuman treatment. The trial court awarded plaintiff an absolute divorce. It awarded defendant custody of a minor child of the parties,

decreed a division of real and personal property of the parties, and awarded support money for the child and alimony to defendant.

Defendant appeals from the judgment, her motion for amended findings and conclusions having been denied. She contends here that the evidence will not support a finding of cruel and inhuman treatment on her part and seeks to have the divorce denied. In a memorandum attached to its order, the trial court stated:

"The Court is of the opinion that the evidence supports the findings of fact and conclusions reached by the Court and filed herein. It appears to us that while the usual violence found in this type of action is not present this is probably due to the education and traditions of the people involved. However, the type of cruelty practiced by the defendant herein, as shown by the evidence, is, in the Court's opinion, the most difficult and severe type that one human being may visit upon another and justifies the relief granted. The cruelty persisted over a long period of time and was not denied by the defendant and her testimony was given in such a manner as to corroborate the testimony of the plaintiff with respect to the cruelty practiced by the defendant."

The record indicates the following: At the time this action was commenced plaintiff was 49 years and defendant 47 years of age. They were married August 29, 1933, in Aurora, Ohio. They have two daughters, one 23 years of age, and one 19 years of age. Since September 1957 plaintiff has been employed as an instructor at Carleton College, Northfield. Prior thereto he had been an instructor at Tufts College in Medford, Massachusetts, but resided in Winchester, Massachusetts, with defendant. Plaintiff moved to Northfield in the late summer of 1957. Defendant has continued to live in the family home at Winchester.

To support his allegation of cruel and inhuman treatment, plaintiff testified as to certain incidents occurring during the marital life of the parties and submitted certain letters to him from defendant. He testified that in March 1955 defendant had locked and bolted the doors of his home while he was absent on school work, so that he could not enter his home, and frequently did so thereafter until after one

such incident he finally left his home in January 1957; that thereafter he had resided in the faculty club at Tufts College and that he had never since resumed marital relations with his wife; that shortly thereafter he moved to Northfield and there resided in a rather small apartment and later in a small room at the faculty club.

As to specific incidents upon which he based his allegation of cruel and inhuman treatment, he testified that after a New Year's Eve celebration in Medford, Massachusetts, defendant had accused him of revealing that he was in love with some woman named Mary, otherwise unidentified; that subsequent to this time and throughout their subsequent married life, defendant had made frequent and unreasonable accusations with reference to his "carrying on with someone named Mary"; that from that date she had made repeated accusations about his relationships with other women; that it became almost a passion for her to make such charges; that at one time she had told him that she had always mistrusted him from the first year of their marriage, although he had always thought that they had been very happy; that during the past few years defendant had exhibited a contemptuous attitude toward him; and that she had frequently made disparaging statements both orally and in writing about his career.

In corroboration of his testimony, plaintiff submitted certain letters written by defendant to him. Therein defendant expressed her opinions of plaintiff as follows:

"* * * You and I have two absolutely opposite points of view on life in general and two absolutely opposite sets of values. To you, sex is uppermost—to me it means nothing, unless there are more basic values with it. * * * To you its important to have everyone jealous of you—to me—I outgrew jealousy at age 18—thank God. To you, you're afraid you'll lose your charm if you mature—to me, you've lost it unless you do mature. To you old age is a thing to dread—to me, it's a thing to look forward to, the most beautiful part of life and for which the rest of life was made. * * * To you religion has never meant anything other than was the chancel well lighted and was the diction of the minister good—to me it is the most deeply satisfying part of life and there is always more to be learned. To you, it's im-

portant to think you never make a mistake—I'm afraid of not making a mistake, I'm afraid of not *seeing* mistakes I *do* make and learning from them. To you it's important to get—to me it's important to give and expect nothing in return * * *. To you, it's important to show others you're more intellectual, more energetic, more of a martyr, a better teacher, a better father, a better husband etc etc—to me modesty is a virtue * * *."

In a letter postmarked January 18, 1958, defendant warned plaintiff that:

"* * * You've set up the same situation for yourself at Carleton that got you fired at Tufts for and the same result is coming. Then you'll try to run again. * * * What kind of a sweet story did you tell Pres. Gould—Were you honest, did you tell him about your adultery charge and that you feel guilty because you have a family to support, so you must squeeze them? And did you tell him that this all comes out in court when you file for a divorce anywhere in the country * * * One thing can be said—no one ever had more fun, excitement or an inflated ego than you in the process of destroying yourself. Glad you told Pres. Gould—that let's Scott off of the hook a little and the Pres. gets it in the neck when it all comes out in court. Heaven help anyone who trusts you—this the kids have found out. Sorry the kids are beginning to hate you—but this you make them do."

In another letter, undated, defendant wrote:

"Jan says Scott hasn't told you yet that you're through at Carleton this year. He told us last summer.

* * * * *

"* * * and how could you sink so low to sue me for desertion?"

In another undated communication, defendant wrote:

"Lust and greed seem to be your basic drives. They have been destroying people and nations for thousands of years. You too?"

There is no evidence that plaintiff had been "fired" from Tufts College. On the contrary, he had been offered a renewal contract.

Likewise, there never was any threat that he would be "fired" from Carleton College. He has forwarded reasonable sums to his wife for family maintenance and support—$1,750 per year to his wife, $1,000 to his younger daughter. He has procured college maintenance for his older daughter to the extent of $2,300, part of which was paid by Carleton College pursuant to a plan for faculty members. He has paid the expenses of maintenance and upkeep for the house in Massachusetts for the past several years. There is evidence that defendant is possessed of an independent income. Plaintiff testified that defendant's conduct and constant accusations and charges had been disruptive of his ability to perform his work as a teacher.

Defendant testified that among other things plaintiff was accustomed to flirting with students; that when he kept doing it on the sly she would see him "but he didn't realize I saw him"; that she was afraid he would lose his job if he kept carrying on with women this way; that she was afraid he would lose his job unless he behaved himself; that "[t]his is why he was asked to leave Tufts"; that Scott Elledge (a mutual friend) had told her that if she were to contest an action for divorce, "Jack [plaintiff] probably won't be able to keep his job at Carleton, it is a small town, but he can get a job somewhere else." Scott Elledge testified that he was acquainted with plaintiff at Carleton College but gave no corroboration to defendant's statements.

We are of the opinion that the evidence outlined is sufficient to support the finding of cruel and inhuman treatment on the part of defendant. Such evidence would establish that during the marital life of the parties defendant had made a practice of repeatedly accusing plaintiff of misconduct; that for several years past she has evidenced suspicions of him; that she has frequently made disparaging remarks about his career; that she has falsely charged that he had lost his employment at Tufts College because of misconduct and discussed this claim with others; that she has falsely claimed that she had been advised that he would lose his position at Carleton College for misconduct; that she has been contemptuous of his ability as a teacher and of his conduct as a man; that while repeatedly ascribing to herself all the virtues of true nobility she has on such occasions in no uncertain

terms expressed her opinions of plaintiff's low estate in all human capacities.

That defendant's continued contemptuous attitude toward plaintiff; her repeated accusations of adultery; and her constant course of faultfinding constituted cruel and inhuman treatment, detrimentally affecting plaintiff in his professional life and destroying the legitimate object of matrimony, cannot be questioned. Williams v. Williams, 101 Minn. 400, 112 N. W. 528; Hrdlicka v. Hrdlicka, 171 Minn. 213, 213 N. W. 919; Eller v. Eller, 182 Minn. 133, 233 N. W. 823. As stated in Thompson v. Thompson, 227 Minn. 256, 259, 35 N. W. (2d) 289, 290:

"An unvarying course of faultfinding, insult and oppression, unrelieved by a pleasant word, and persisted in for many years, may become more intolerable than blows, * * *."

In 6 Dunnell, Dig. (3 ed.) § 2778, and cases cited, the applicable principles are summarized as follows:

"Cruelty justifying a divorce may consist in * * * a malicious and groundless charge of adultery; or a systematic course of ill treatment, consisting of continued scolding and faultfinding, using unkind language, studied contempt and petty acts of a malicious nature * * * or any serious misconduct which, unjustified in fact, is so plainly subversive of the relationship of husband and wife as to make it impossible to discharge the duties of married life and to obtain its objects, and to be so hopelessly inimical to the health or the personal welfare of the injured party as to render continuance of the relationship intolerable."

Under the principles expressed, the evidence submitted, and the trial court's summations after opportunity of viewing the parties, we conclude that the judgment appealed from should be affirmed.

Affirmed.